IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA**,

**Plaintiff,**

**v.**

**PHILLIP D. WEBB,**

**Defendant.**                                            No. 12-30268-DRH

**MEMORANDUM and ORDER**

**HERNDON, Chief Judge**:

### I. Introduction and Background

Pending before the Court is defendant's motion to suppress identification evidence (Doc. 36). Webb argues that the photo displays conducted by the Madison Police Department were not fairly conducted and deprived him of his due process right. The government opposes the motion (Doc. 39). On June 3, 2013, the Court held a suppression hearing and took the matter under advisement. After reviewing the record and applicable law, the Court **DENIES** the motion.

On January 23, 2013, the grand jury returned a four-count superseding indictment against Webb (Doc. 23). Count 1 is for bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d); Count 2 is for use and carry of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §942(c)(1)(A); Count 3 is

for possession with the intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and Count 4 is for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The superseding indictment also contains a forfeiture allegation as to firearms and ammunition.

The motion to suppress pertains to Counts 1 and 2 of the superseding indictment as it is directed to a photograph line-up identification stemming from a carjacking and bank robbery that occurred on June 28, 2011.[1] The hearing on the motion to suppress was limited to the suggestibility of the line-up, thus, the Court sets forth only the pertinent facts surrounding the June 28, 2011 incident.

On June 28, 2011, Lynn Lanham and her mother were carjacked at gun point by an African-American male at a Quick Trip gas station in Madison, Illinois. The African-American male got in the back seat of the car on the driver's side, pointed the gun at the women, demanded their money and ordered them to drive to an ATM.

Ms. Lanham testified that while she was in the car with the man that she was able to see his face through her rear-view mirror. She further testified that he was not wearing a mask, that his face was not covered and that she looked at him a lot.[2] She noted that the person did not have a mean appearance. She also stated that since he did not have hair she focused on the roundness of his face, eyes and checks. Once he was out of the car, Ms. Lanham reported the incident

---

[1] Counts 3 and 4 pertain to a separate incident that occurred on July 18, 2011.
[2] Lanham also testified that when her mother turned around to look at him, he covered his mouth with his shirt but that while they were driving he did not have his face covered.

to police and gave a description of the male.

Thereafter, Ms. Lanham and her mother went to the Madison Police Department where she gave a written statement. Ms. Lanham's description of the male matched Sergeant Dennis Pinero's observance of Webb in the vicinity of the Quick Trip gas station 30 or 45 minutes before the robbery. Thus, defendant Webb became a suspect for the crime.

Officer Michael Renth searched the Madison Police department PIP system for a photograph of Webb and could not find one. He also searched Webb's criminal history and contacted the Madison County Sheriff's department after he noticed that it had a photograph of Webb on file. He asked Detective Sergeant Carol Presson to prepare a line-up with Webb's dated booking photograph. She did so and emailed it back to Officer Renth. Renth reviewed the line-up and showed the line-up to Ms. Lanham. Ms. Lanham was unable to identify a suspect. In the dated line-up picture, Webb had hair, while at the time of the incident, Webb was bald.

Thereafter on July 7, 2011, Officer Renth obtained a second photo array containing Webb's picture from Special Agent Mike Swindle of the Illinois State Police. Special Agent Swindle compiled another line-up using an up-to-date photograph of Webb from the Illinois Department of Corrections. Special Agent Swindle made a template and pulled individual pictures off the Illinois Department of Corrections Website and fit them into the template.

After obtaining the line-up, Officer Renth contacted Ms. Lanham and went

to her house. Officer Renth showed her the line-up. She reviewed the line-up and identified suspect Number 5. She initialed the array and wrote on the array "man who robbed me." Officer Renth put the date, the time, "viewed by Lynn Lanham", his name and "Madison PD" on the array.

## II. Legal Standard

On February 28, 2013, in *United States v. Sanders*, 708 F.3d 976 (7th Cir. 2013), the Seventh Circuit set forth the standard for identification testimony.

> Our Constitution protects against "conviction based on evidence of questionable reliability." *Perry v. New Hampshire,* ––– U.S. ––––, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012). Despite the importance of this right, the admission of evidence rarely implicates due process. *See id.* Rather, courts typically rely on other means to ensure reliable evidence—state and federal rules, as well as different constitutional guarantees, such as the Sixth Amendment rights to counsel and confrontation. *Id.* Yet, "when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' " due process, like the sleeping giant, awakens. *Id.* ( *quoting Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). In those situations, other protections have proven insufficient, and courts must step in to prevent injustice.
>
> Unduly suggestive identification procedures represent one example of those fundamentally unfair situations. A procedure becomes so flawed as to implicate due process when it creates a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ( *quoting Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). In such cases, the identification must be suppressed. *Perry,* 132 S.Ct. at 724–25. To decide whether a situation has risen to that level, we follow a two-pronged approach. First, we consider whether the identification procedure used by law enforcement was "both suggestive and unnecessary." *Id.* at 724; *accord United States v. Gallo–Moreno,* 584 F.3d 751, 757 (7th Cir.2009). Second, we examine the "totality of the circumstances" to determine whether other indicia of reliability "outweigh[ ] ... the corrupting effect of law enforcement suggestion." *Perry,* 132 S.Ct. at 725 (internal quotation marks omitted); *accord Gallo–Moreno,* 584 F.3d at 757.

> As the Supreme Court recently reiterated, courts will only consider the second prong if a challenged procedure does not pass muster under the first. *See Perry,* 132 S.Ct. at 730. To fail the first prong, however, even a "suggestive" procedure must also be "unnecessary." *Id.* at 724. In other words, the situation must have involved "improper state conduct"—one in which the circumstances did not justify law enforcement's suggestive behavior. *Id.* at 728. As these descriptions show, both prongs are highly situation-dependent, which may seem to blend the two inquires. Yet, they are distinct. The first prong focuses on police conduct—its suggestiveness and necessity in the specific situation at hand. In contrast, the second prong focuses on the identifying witness and her knowledge of the suspect absent the suggestive procedure. Perhaps, for example, the witness saw the suspect for several minutes in broad daylight. *See United States v. Kimbrough,* 528 F.2d 1242, 1246–47 (7th Cir.1976). Such considerations could lead us to conclude that an unduly suggestive identification was nonetheless reliable, such that its admission would not violate the Due Process Clause. *See id.*

*United States v. Sanders*, 708 F.3d 976, 983-984 (7th Cir. 2013). With these principles in mind, the Court turns to the merits of the motion.

### III. Analysis

"The Supreme Court has warned that showing witnesses a photograph of the same person several times may increase the risk of misidentification." *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003)(citing *Simmons v. United States*, 390 U.S. 377, 383-85, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). "The danger to be avoided in identification procedures is that of *orchestrating* the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that "this is the man." *Id*. "[T]here is nothing *per se* unconstitutional about showing witnesses the photograph of a particular suspect multiple times as part of an array." *Id*. (citations omitted).

Moreover, the Seventh Circuit has "approved repeatedly line-ups composed of individuals who have like features." *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002). "[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures." *Id.* (citing *Gullick v. Perrin*, 669 F.2d 1, 5 (1st Cir. 1981)). Furthermore, the Seventh Circuit has repeatedly held that six individuals is a sufficient number of photographs for a line-up. *United States v. Carter*, 410 F.3d 942, 948 (7th Cir. 2005); *United States v. Galati*, 230 F.3d 254, 260 (7th Cir. 2000); *United States v. Moore*, 115 F.3cd 1348, 1360 (7th Cir. 1997); *United States v. Sleet*, 54 F.3d 303, 309 (7th Cir. 1995).

Defendant places his entire focus and reliance on the sole issue of suggestibility. Specifically, he maintains that the identification process was flawed because there were more photographic arrays than those that were produced. His first focus on this inquiry is that the primary officer, Officer Michael Renth, of the Madison Police Department, is untrustworthy. Thus, defendant contends that because of Officer Renth's untrustworthiness, the Court cannot believe that his testimony is true or that the identification process was done legitimately. The Court disagrees with defendant's assessment.

Clearly, there are personal and personnel issues with regard to Officer Renth. He has been demoted from Detective to police officer of some lesser rank. Further, there is an ongoing internal affairs investigation regarding an incident that happened while off-duty which was precipitated from a softball game

involving his girlfriend and others who had some history of disagreement.

Based on the Court's observation of Officer Renth and how his testimony fit with the other testimony presented at the suppression hearing which the Court found credible, the Court assessed Officer Renth's testimony as it relates to this case as credible. Specifically, Officer Renth testified the following as to the photograph arrays and identification process utilized in this case.

> Ms. Summers: Did you talk to her on scene?
> Officer Renth: Yes, briefly.
> Ms. Summers: And did she give you a description at the time of the offender?
> Officer Renth: She – myself and the Chief Shelby at the time arrived and she had brief description and then the location that she – that it had occurred.
> Ms. Summers: Okay. And brief description of the offender, what he looked like, what he was wearing, those kinds of things?
> Officer Renth: That's correct.
> . . .
>
> Ms. Summers: Okay. And did Sergeant Pinero give you any information at that time?
> Officer Renth: He later advised that he had observed a light complected black male that fit the description of Phillip Webb approximately 30 to 45 minutes prior to the robbery about two blocks from that area.
> Ms. Summers: He said matching the clothing description that victims had given, is that correct?
> Officer Renth: That's correct.
> Ms. Summers: Based on that information, it's fair to say that at that point Phillip Webb became a suspect for your department.
> Officer Renth: Yes, he did.
> . . .
>
> Ms. Summers: Okay. But with regard to possibly identifying this individual, in talking with Lynn Lanham, were you able to – did you compile a photographic line-up?
> Officer Renth: We had no photos of Phillip Webb. I searched his criminal history and contacted the Madison County Sheriff when I noticed they had a photo on file.
> Ms. Summers: What would be your normal process for conducting a

photographic line-up?
Officer Renth: We have the PIP system. Basically I would be able to go in there – if there's a suspect in mind I can put their name in there and actually pull that person to place them on the line-up, and from that point I would use characteristics similar to the suspect to find like persons to put in the line-up.
Ms. Summers: But you can only use the photographs that are in your system to do that?
Officer Renth: That's correct.

. . .

Ms. Summers: And you did not have a photograph of Mr. Webb?
Officer Renth: I did not.
Ms. Summers: Had you any prior dealing with Mr. Webb yourself?
Officer Renth: No, I did not.

. . .

Ms. Summers: And as you testified on direct examination, there was an IDOC picture that had been show to people at your department prior to this robbery, correct?
Officer Renth: That's correct.
Ms. Summers: And Sergeant Pinero had seen that picture?
Officer Renth: Yes.
Ms. Summers: Had you seen that picture?
Officer Renth: I did not.
Ms. Summers: But did you know it existed?
Officer Renth: I knew there was a person of interest, yes.

. . .

Ms. Summers: But that picture was not in your system?
Officer Renth: No, it was not.

. . .

Officer Renth: I contacted Carol Preston with the Madison County Sheriff's Department, asked her if she could take the time to prepare a line-up for me. I provided Phillip Webb's name and date of birth. She said that she had a dated photo but she could try to put on together, which she did, and then she e-mailed it back to me. I reviewed it, let the – showed it to the victim. She was unable to make an ID at that time. At the time Phillip Webb was actually had a shaved head and the photo he had hair.

. . .

Page **8** of **19**

Ms. Summers: And did you – when you printed it out did you print it out once or more than once?
Officer Renth: I printed out a copy without the names to show to the victim, and then I had a master copy, which was the same pictures but it just had names on every photo to identify each person.
Ms. Summers: And you only showed her the one without names?
Officer Renth: That's correct.
Ms. Summers: And she was not able to make an identification?
Officer Renth: That's correct.
Ms. Summers: Did you show her other photo arrays?
Officer Renth:  Not that day.
. . .

Ms. Summers: And when you showed that to her did you suggest to her in any way that you had a suspect?
Officer Renth: No.
Ms. Summers: Did you suggest to her who – the name of the suspect?
Officer Renth: No.
Ms. Summers: Did you point out a picture and say, really take a good look at this guy, it's an old picture, but you may be able to recognize him?
Officer Renth: No.
Ms. Summers: What did you say to her?
Officer Renth: Basically what I do with every person I show a line-up to, I explain to them they're under no obligation to make an identification; the suspect may or may not appear in the line-up; they could take their time to review it. ….
. . .

Ms. Summers: But again, you didn't make any suggestions to her?
Officer Renth: No, I did not.
. . .

Ms. Summers: And when you – how did you obtain the second photo array?
Officer Renth: I spoke to Special Agent Mike Swindel of the Illinois State Police.  He had told me that he had compiled another line-up from the DOC pictures and that was an up-to-date photo and I was welcome to have a copy of it.
. . .

Ms. Summers: And with regard to knowing that there was this more recent photograph, why didn't you attempt to compile such a line-up with that photograph?
Officer Renth: That's something I've never done before and still haven't.

This was a thing that Mike had put together because of our limited photos of the suspect.

. . .

Ms. Summers: So when you find out this line-up exists, then you obtain it from Mike Swindel, is that correct?
Officer Renth: Yes.
Ms. Summers: And then what do you do with it?
Officer Renth: I make contact with the victim, Lynn Lanham, and she agrees to meet me at her residence. I go out there, I meet with her. I believe it was her husband that was also present. She takes her time to review it. Again, I tell her the same thing: Take your time looking at this; your suspect may or may not be in here; you're under no obligation to identify anybody.
Ms. Summers: And was she able to make an identification from that photo array?
Officer Renth: Yes, she was.
Ms. Summers: And that's Defendant's Exhibit B?
Officer Renth: Yes.
Ms. Summers: And when so you handed her that picture, that photo array, that didn't have any markings on it yet, correct?
Officer Renth: That's correct.
Ms. Summers: Then did she write on that?
Officer Renth: She did.
Ms. Summers: On that piece of paper?
Officer Renth: Yes, she did.
Ms. Summers: And she identified suspect No. 5, or person No. 5?
Officer Renth: That's correct.
Ms. Summers: Then she also wrote, "Man who robbed me", and her initials?
Officer Renth: Yes.
Ms. Summer: And the other markings on that paper, who wrote those?
Officer Renth: I did.
Ms. Summers: What do those markings contain?
Officer Renth: I put the date, the time, "Viewed by Lynn Lanham", and my name, and "Madison PD".
Ms. Summers: And before she viewed this line-up did you suggest to her that you had a suspect?
Officer Renth: No, I did not.
Ms. Summers: Or that you had a new picture of the suspect?
Officer Renth: No, I did not.
Ms. Summers: Did you suggest to her then or say the name of the suspect?
Officer Renth: No, I did not.
Ms. Summers: Did you tell her, take a close look at any particular number

>or do anything else to suggest who the suspect may be?
>Officer Renth: No, I did not.
>Ms. Summers: After she made the identification of the person in position No. 5, did you say anything to her?
>Officer Renth: No.
>Ms. Summers: Did you say anything at all generally with regard to that?
>Officer Renth: No. I never indicated that she selected the suspect we had in mind or that she made the wrong choice. I thanked her for her time and told he that we'd be in touch.
>Ms. Summers: That's your memory of it?
>Officer Renth: Yes.
>Ms. Summers: And even then did you tell her the name of the person you had in mind?
>Officer Renth: No, I did not.
>Ms. Summers: Did you have any contact with Lynn Lanham after you showed her that line-up on July 7th?
>Officer Renth: No, I did not.
>Ms. Summers: Did you ever contact her to tell her that a person had been charged with this robbery?
>Ms. Summers: No, I did not.

Further, Ms. Lanham's testified the following.

>Mr. Herman: At that point you were shown what we're going to mark as Defendant's Exhibit A. Ma'am, I am showing you what's been marked as Defendant's Exhibit A, and I believe when we discussed this you looked at a black-and-white copy of this, but do you recognize this as the first of the photo line-ups that you were shown?
>Ms. Lanham: Yes.
>Mr. Herman: And at that time what were you told about the people in these pictures?
>Ms. Lanham: Nothing.
>Mr. Herman: And at that time when you were first shown that picture at the police station were you able to make an identification?
>Ms. Lanham: No.
>Mr. Herman: You did not recognize anyone in that picture?
>Ms. Lanham: No.
>. . .
>Ms. Summers: And when you were shown those line-ups can you explain what you were – how that process went?
>Ms. Lanham: They just asked – put the pictures in front of me and asked me if I saw – could identify the person in the picture as the person that I was describing. And I looked at the pictures and said no. And then some

of the pictures were more blurry so they would make the picture – try to make the pictures more clear, but those pictures did not look like the person that I remembered.

. . .

Ms. Summers: And then nine days later an officer came to your house to show you a line-up, is that right?
Ms. Lanham: That's correct.
Ms. Summers: Between the time that you were at the police station and the time the police officer came to your house, did anybody from the Madison Police Department contact you?
Ms. Lanham: No.
Ms. Summers: Did you – were you shown any other photographs?
Ms. Lanham: No.
Ms. Summers: -- at all with regard to this incident? Nobody contacted you for any reason?
Ms. Lanham: No.
Ms. Summers: When you were contacted, how were you contacted?
Ms. Lanham: I was contacted by phone.
Ms. Summers: And was a police officer?
Ms. Lanham: Yes.
Ms. Summers: I believe you testified you don't recall his name?
Ms. Lanham: Correct.
Ms. Summers: And what did he say when he called you?
Ms. Lanham: He asked if he could meet with me because he had some additional photographs that he wanted me to look at.
Ms. Summers: And did he come to your house that day?
Ms. Lanham: He did.
Ms. Summers: All right. Was anybody else at your house with you when he came.
Ms. Lanham: Yes.
Ms. Summers: Who?
Ms. Lanham: Andrew Rees.

. . .

Ms. Summers: When the officer got there, what happened?
Ms. Lanham: We were outside on my patio in the back yard, and he – I sat down and he asked me to look at the pictures, and I looked at the pictures and I saw the picture of the person I knew as the person that was in my car.
Ms. Summers: Okay. And the person who robbed you?
Ms. Lanham: Yes.
Ms. Summers: I am going to show you again Defendant's Exhibit B. That is the photographic line-up that you were shown that day at your house?
Ms. Lanham: Correct.
Ms. Summers: And there are some markings on this line-up. Were they

there when you were shown the line-up?
Ms. Lanham: No.
Ms. Summers: Who made those markings?
Ms. Lanham: I made the markings on the paper.

. . .

Ms. Lanham: I circled the number 5 and I put my initials and I wrote, "The man who robbed me".
Ms. Summers: Why did you choose – why did you do that?
Ms. Lanham: Why did I write that? Because that is the person who robbed me.
Ms. Summers: And before you made that identification, did Officer – did the officer say anything to you about the photographs that he was showing?
Ms. Lanham: No.
Ms. Summers: Did he tell you even that they had a suspect?
Ms. Lanham: No,
Ms. Summers: Did he tell you the name of a suspect?
Ms. Lanham: No.
Ms. Summers: Did he suggest to you in any way that even a suspect was in this line-up?
Ms. Lanham: No.
Ms. Summers: Did he tell you, *Take a good look at picture numbers*, whatever?
Ms. Lanham: No.
Ms. Summers: He didn't say anything at all?
Ms. Lanham: No.
Ms. Summers. After you choose No. 5 as the man who robbed you, did the officer say anything to you at that time that you recall?
Ms. Lanham: No.
Ms. Summers: Okay.  So after you – when he left, he just took it and left?
Ms. Lanham: Yes.
Ms. Summers: Did he say anything at all about what would happen from that point forward?
Ms. Lanham: I was feeling good and confident because I was happy that I had chosen the person that – I identified that person, but I didn't get the feeling from him that he was going to do anything about it.  I didn't get the feeling he knew anything about that person or that – he didn't lead to believe that I would hear anything.
Ms. Summers: Okay. So even after that time he doesn't tell you the name of this person?
Ms. Lanham: No.
Ms. Summers: And even after you made that identification he doesn't say *Yeah, that's our suspect*, to you?
Ms. Lanham: No.

> Ms. Summers: And then I just want to go back with regard to -- at the police station when you were shown the line-up, the one that you've identified as Defendant's Exhibit A, did the officer make any suggestion to you when he showed you those pictures as to who a suspect may be?
> Ms. Lanham: No.
> Ms. Summers: Did he say anything to you to suggest that they even had a suspect?
> Ms. Lanham: No.
> Ms. Summers: Did he give you the name of a suspect at that time?
> Ms. Lanham: No.
> Ms. Summers: Did he point to any of the pictures of tell you, *Take a good look at Picture No. 4*, or anything like that?
> Ms. Lanham: No.

Ms. Lanham's testimony clearly coincides with Officer Renth's testimony as to the identification process utilized in this case. Thus, the Court finds Officer Renth's testimony credible regarding the identification process.

Next, defendant contends that the victim testified about being shown other photographs which were not produced and that affects the suggestibility and his due process rights to challenge the suggestibility of the photographic line-up. Frankly, the Court must admit to confusion here in more regard than one. First of all, the victim is very confused on this issue. Her testimony in total is as follows.

> Mr. Herman: And some of them were single face to a page and some of them were multiple faces to a page, correct?
> Ms. Lanham: Yes.
> Mr. Herman: And have you seen any of those photographs since then?
> Ms. Lanham: Have I seen these since then?
> Mr. Herman: Have you seen any of the others besides the two you're looking at?
> Ms. Lanham: No.
> Mr. Herman: But there were others besides the two pages that you're looking at which are currently Exhibits A and B?

Ms. Lanham: Yes.
Mr. Herman: Do you remember, was it more than five other pictures?
Ms. Lanham: I don't remember.
Mr. Herman: Was it more than one?
Ms. Lanham: Yes.
Mr. Herman: Was it more than two?
Ms. Lanham: More than one picture or more than one page?
Mr. Herman: More than one page.
Ms. Lanham: More than one page. More than one page.
Mr. Herman: So what I am trying to make clear is, in addition to the two that are sitting in front of you, there were at least two or more pages of photographs that were shown to you, correct?
Ms. Lanham: At the police station.
Mr. Herman: At the police station?
Ms. Lanham: Uh-huh.
Mr. Herman: And they were not the same photographs that you're looking at in A and B in front of you, correct?
Ms. Lanham: Correct.
Mr. Herman: Has anyone, since the date of the meeting at the police station, shown you those other pictures aside from what's before you in A and B?
Ms. Lanham: I'm sorry. One more time.
Mr. Herman: I'm sorry. It's Monday morning and I'm not making myself as clear as I probably could. Need more coffee maybe.
Ms. Lanham: One more time.
Mr. Herman: All right. You have A and B in front of you?
Ms. Lanham: Uh-huh.
Mr. Herman: All right. There were other pages of photographs besides A and B?
Ms. Lanham: Yes.
Mr. Herman: At least two other pages of photographs?
Ms. Lanham: Yes.
Mr. Herman: And some of them had multiple pictures on a page?
Ms. Lanham: Yes.
Mr. Herman: And they were different than the multiple pictures that you're looking at on A and B, correct?
Ms. Lanham: Yes.
Ms. Herman: And some of them were individual pictures that were shown to you, correct?
Mr. Lanham: When you say "individual", do you mean there was just one picture?
Mr. Herman: One per page.
Ms. Lanham: No.
Mr. Herman: So there were other photo – there were other photo line-ups

Page **15** of **19**

we call them, multiple pictures on a page, correct?
Ms. Lanham: Yes.
Mr. Herman: And they were different from A and B that you're looking at right now?
Ms. Lanham: Prior to at the police station they were different, yes.
Mr. Herman: And this is all prior to an officer coming to your house with Exhibit B?
Ms. Lanham: Yes.
Mr. Herman: So let me make it very clear because the important part here is that we get the court reporter – we accurately provide information for the court reporter so that somebody reading this can understand what we're getting at, okay? My fault probably. You were shown A at the police station.
Ms. Lanham: Yes.
Mr. Herman: And that's on the day of the incident?
Ms. Lanham: Uh-huh.
Mr. Herman: Yes?
Ms. Lanham: Yes. I'm sorry.
Mr. Herman: And on that day you did not – were not able to identify any person in Exhibit A as the person who caused this crime, committed this crime, correct?
Mr. Lanham: Correct.
Mr. Herman: And on that same day you were shown other photographs?
Ms. Lanham: Correct.
Mr. Herman: And on that same day you were shown other pages with numerous photographs per page, correct?
Ms. Lanham: Yes.
Mr. Herman: Were they in color or black-and-white?
Ms. Lanham: Black-and-white.
Mr. Herman: All right. And you think it was at least two more, two additional to A or B?
Ms. Lanham: Yes.
Mr. Herman: Maybe three?
Ms. Lanham: I don't know.
Mr. Herman: The officer—I believe you told us at the plea of guilty that we had at the U.S. Attorney's Office that the officer kept going back and forth to the computer and bringing more pictures to you, is that right?
Ms. Lanham: Yes. The pictures were blurry.
Mr. Herman: Pictures were blurry, okay. But they were not the same as either A or B, correct?
Ms. Lanham: I did see A – I did not see B; I saw A.
Mr. Herman: You saw A and others that we don't have here today?
Ms. Lanham: Uh-huh, yes.

. . .

Page **16** of **19**

>Ms. Summers: And it's your testimony that you believe that there were other pictures that you saw?
>Ms. Lanham: At the police station.
>Ms. Summers: And some of them were blurry or darker or not able to really see the photograph?
>Ms. Lanham: Correct.
>Ms. Summers: And – but regardless, you were not – you did not see any photograph that looked like the offender?
>Ms. Lanham: Correct.
>. . .
>Mr. Herman: So the other pictures you were shown were individual pictures?
>Ms. Lanham: No.
>Mr. Herman: One photo to a page or two photos to a page?
>Ms. Lanham: No.
>Mr. Herman: How did that work?
>Ms. Lanham: There was many pictures on a page.
>Mr. Herman: Many pictures on a page. More than six?
>Ms. Lanham: They weren't as big as that one.
>Mr. Herman: So many little pictures on a page?
>Ms. Lanham: Uh-huh.
>Mr. Herman: Were they all black men with hair or black men bald?
>Ms. Lanham: I don't remember if they were all the same or different.
>Ms. Herman: And were there more than one page of multiple photograph pictures that you were shown?
>Ms. Lanham: Yes.

The Court cannot say with any certainty that she was shown multiple sets because of her confusion. It is possible that she is just talking about the process involved to show her the one array that she was ultimately shown and that resulted in Defendant's Exhibit A. However, even if she was shown multiple photographic arrays, they were arrays with multiple pictures, but with pictures that were blurry. Clearly, the Seventh Circuit has found that multiple arrays are not suggestible and are appropriate. *Gregory-Bey*, 332 F.3d at 1045; *Harris*, 28 F.3d at 671 ("[w]e have approved repeated line-ups composed of individuals who

share like features."); *Stewart v. Duckworth*, 93 F.3d 262, 265-66 (7th Cir. 1996)(showing a witness photos of the same suspect three separate times along with other pictures did not render the identification unduly suggestive because the photos were markedly separate, distinct and different).

Particularly if the pictures were blurry, there is no issue with regard to suggestibility as far as defendant Webb is concerned and Ms. Lanham did not identify defendant Webb. The Court is not convinced by defendant's argument that these other mysterious photographic arrays can establish suggestibility when they did not lead to any identification. Moreover, the victim did not testify that there was any suggestive comments about the pictures themselves. Ms. Lanham certainly did not testify that any officer made suggestive comments with the objective of trying to get her to focus on one particular person in these other supposed arrays of photographs.

The evidence presented at the hearing demonstrates that the last photo array in which Ms. Lanham identified defendant was presented without suggestive process. Ms. Lanham, Mr, Rees and Officer Renth all testified that nothing suggestive happened during that photo identification. Further, all six of the men in the photo array are African-American males around the same age. All six men have a bald or shaved head, have similar facial features and are all clothed in a yellow shirt. Moreover, Ms. Lanham testified that she could see defendant through her review mirror while he was in her car. She also testified that he did not have a mean appearance, that he had no hair and that he had a "roundness"

about him. Ms. Lanham clearly identified defendant in the second photo array as the "man who robbed me." There is no evidence that she had difficulty selecting Webb from the second or last array. Ms. Lanham's identification of Webb was neither unduly suggestive nor under the totality of the circumstances unreliable. The suppression of the identification evidence is not warranted under the facts of this case.

### IV. Conclusion

Accordingly, the Court **DENIES** defendant's motion to suppress identification evidence (Doc. 36). The Court **REMINDS** the parties that this matter is set for jury trial October 21, 2013 at 9:00 a.m.

**IT IS SO ORDERED.**

Signed this 13th day of June, 2013.

Digitally signed by David R. Herndon
Date: 2013.06.13 16:12:35 -05'00'

**Chief Judge
United States District Court**